Anthony Quinn **ROBINSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 03–95–00755–CR.

Court of Appeals of Texas, Austin.

May 8, 1997.

William Barbisch, Austin, for appellant.

Ronald Earle, District Attorney, C. Bryan Case, Jr., Assistant District Attorney, Austin, for appellee.

Before ABOUSSIE, JONES and DAVIS,* JJ.

TOM G. DAVIS, Justice (Retired).

After finding appellant guilty of the offense of murder, Tex. Penal Code Ann. 19.02(b)(2) (West 1994), the jury assessed punishment at confinement for forty years. Appellant asserts five points of error, contending the trial court erred because: (1) Section 19.02 of the Texas Penal Code violates the Due Process Clause of the United States Constitution; (2) Section 19.02 violates the due course of law provision of the Texas Constitution; (3) Section 19.02 violates the open courts provision of the Texas constitution; (4) the evidence is insufficient to support the conviction; and (5) the trial court refused to grant appellant's requested charge on the lesser included offense of manslaugh-

---

* Before Tom G. Davis, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1988).

ter. We will overrule appellant's points of error and affirm the judgment of the trial court.

We first consider appellant's fourth point of error challenging the sufficiency of the evidence to support the conviction with the hope that a review of the evidence will lend clarity to our discussion of the remaining points of error. The events that preceded the February 18, 1995, fatal shooting of John McQuay as he sat drinking coffee in his second floor apartment at the Walnut Manor Apartment on Manor Road and Walnut Street in Austin began the evening before. The testimony of Sydney Clark, Jr. (Sydney) established that he and Keith Robinson (Keith) passed the apartments while they were "just riding, just hanging out." A person Sydney identified as Dante Westbrook hollered to them from the apartments, "[d]id you thought we squashed that?" After Keith drove Sydney to his girlfriend's house, Keith returned to the apartments. Keith testified that Westbrook shot at him, a statement that Westbrook denied. Bullet holes were found in the car Keith was driving.

The next morning Keith, Sydney, and appellant (Keith's brother) "rolled" by the apartment complex where Sydney had seen Westbrook the night before. When they spotted Westbrook, Keith drove their vehicle into the driveway and ran up the stairs behind Westbrook, calling for Westbrook to come talk to him. Sydney next heard gunshots and saw Keith run downstairs and get behind a Chevrolet, "that's when I saw [Westbrook] shooting a gun." Sydney backed their car out, hit another vehicle, and at appellant's direction drove to appellant's grandmother's house in order that appellant might pick up a Chinese assault rifle. Keith was left behind. Although they had a ".45" in the car, Sydney stated they were in a hurry to get the assault weapon. After picking up the assault weapon, appellant returned to the Cadillac they were driving and directed Sydney to drive back to the apartment. When Sydney expressed some reluctance because police would probably be there, appellant fired the assault weapon

through the windshield of the car. Despite the fact that Sydney sustained injuries to his arm from the shattered glass, Sydney disregarded appellant's suggestion that he go to the hospital and proceeded to the apartment. The entire round-trip to get the assault weapon consumed less than ten minutes. As they drove by the apartment, appellant leaned out of the window with the assault weapon and Sydney heard "about three shots."

Austin police officer Jim Andrist testified that he responded to the dispatcher's call to go to the apartment in question. Upon arrival, Andrist heard a series of seven to ten very loud shots. Andrist turned to where he heard the shots and saw an old Cadillac proceeding very slow in a southbound direction on Walnut Street. He could see a man "on top of the car ... with his arms out, and he had an assault rifle in his hands." The man got back in the car and threw the assault rifle out of the auto. The vehicle accelerated through a stop sign, and subsequently pulled into an apartment complex.

Westbrook's testimony establishes that he went to the apartments that morning to check on an elderly uncle. He was outside the apartments when a Cadillac pulled into the driveway, a man got out and pointed a gun toward him. Westbrook did not know him and ran to his cousin's apartment on the second floor to get a gun he had seen there before. Westbrook went for the gun because a "guy with a gun was coming after me." When he emerged from the building, Westbrook saw the man who fired the earlier shots still in the parking lot with his gun "pointed at me."

The other people in the Cadillac had left, leading Westbrook to believe they would "come around the corner." Westbrook stated that he fired two warning shots that might cause them to leave.[1] Shortly thereafter, Westbrook heard tires screeching, followed by "big shots," saw a gun barrel sticking out of the Cadillac window, and ducked down. As the police car approached, Westbrook saw the gun tossed out of the car's window. He feared that someone might be

---

1. Westbrook stated he was under deferred adjudication in both Harris and Travis Counties and

expressed concern about what might happen as a result of this incident.

coming after him because he had been in an argument with some guys because his cousin had been robbed.

The conviction was based on the second paragraph of the indictment charging in pertinent part that appellant "did then and there intending to cause serious bodily injury to Dante Westbrook commit an act clearly dangerous to human life, to wit: shoot a firearm, a deadly weapon, into a habitation occupied by John McQuay thereby causing the death of the said John McQuay." Appellant contends the evidence is insufficient to show the essential element of intent to cause death or serious bodily injury to Westbrook because appellant fired the assault weapon into an utility room in an apparent effort to scare Westbrook. Appellant also directs our attention to Westbrook's testimony that placed him in a position where appellant could not have seen him when he fired the assault weapon.

■ In reviewing the legal sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *Casillas v. State,* 733 S.W.2d 158, 160 (Tex. Crim.App.1986), *appeal dismissed,* 484 U.S. 918, 108 S.Ct. 277, 98 L.Ed.2d 238 (1987). The standard of review is the same for direct and circumstantial evidence cases. *Geesa v. State,* 820 S.W.2d 154, 162 (Tex.Crim.App. 1991).

Appellant relies on *Ishmael v. State,* 688 S.W.2d 252 (Tex.App.—Ft. Worth 1985, pet. ref'd). The issue in *Ishmael* was whether the grand jury was diligent in trying to obtain the identity of the victim since the indictment alleged that the victim was a person unknown to the grand jury. After being escorted from a night club by two of its employees, the defendant threatened to kill them. The defendant returned thirty minutes later and shot a hole through the door of the club, killing a third person. The court held that "He [the defendant] had no rational basis to believe that the person he wanted to kill was standing on the opposite side of the door through which he fired." *Id.* at 258. Appellant urges that there is no evidence to place Westbrook at the northwest corner of the apartment complex, the place where appellant fired his shots, from which an inference could rationally be inferred that appellant intended to kill or injure Westbrook. Appellant points to Westbrook's testimony that places him at the northeast corner of the apartment complex when he heard the shots.

Westbrook testified that he was trying to keep an eye on the man who had remained when he heard screeching tires on the Walnut Street side of the apartment. He ran to the Walnut corner, "got down," and that's when I saw the Cadillac with the gun out the window. Westbrook was "moving fast" because he had to keep his eyes on "two sides of the building at one time." Under cross-examination, defense counsel elicited the following answer from Westbrook:

Q. So if somebody had been driving down this street [Walnut], they might have seen you at that corner because you had been at this corner peeking around still trying to keep yourself under cover right before you went around the corner when you heard the shots; is that a fair statement, sir?

A. Yeah, that's fair.

In another point of error, appellant states that the defense had to propose a theory that appellant may have seen Westbrook to support a charge on defense of a third party since the trial court rejected defense counsel's requested charge on manslaughter. This does not appear to be a plausible reason for posing the hypothetical question at a time prior to the close of testimony and the trial court's rejection of appellant's requested charge on manslaughter.

■ We find the cumulative effect of all the incriminating circumstances sufficient to sustain the jury's verdict under the *Jackson* standard. Viewing the evidence in the light most favorable to the verdict, we find a number of incriminating circumstances that furnish the underpinning of the verdict. Appellant, along with Sydney and Keith, drove to the apartment where Keith told him that Westbrook had shot at him the prior evening.

When appellant saw Westbrook shooting a gun, he urged Sydney to leave in such great haste to get the automatic rifle that he left his brother, Keith in harm's way. When Sydney advised against returning to the apartment complex because of the likely presence of police, appellant was so intent on his mission that he fired the automatic rifle into the windshield. Westbrook's testimony reflects that he was moving very fast in an effort to avoid perceived threats from both sides of the apartment and opined that a person in appellant's place with an automatic rifle could have seen him. Calvin Story, a forensic firearms examiner with the Austin Police Department, detailed how he used a lazer and a rod in determining that appellant fired the weapon in a "general upward motion toward the apartment" even though entry of bullets was shown to have been through the utility room. We find the foregoing evidence inconsistent with appellant's theory that he was firing at the utility room to scare Westbrook. The jury could have reasonably inferred that appellant would have continued firing the assault weapon had he not become aware of the presence of police and attempted to discard the weapon. We hold that any rational trier of fact could have found under the *Jackson* standard that appellant intended to cause serious bodily injury or death to Westbrook.

While appellant does not make an explicit challenge to the factual sufficiency of the evidence, we find his point of error broad enough to be inclusive of such a review. The factual sufficiency of the evidence is reviewed in *Stone v. State*, 823 S.W.2d 375 (Tex.App.—Austin 1992, pet. ref'd untimely filed) and *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim.App.1996) (adopting *Stone* test). In *Stone*, this Court set forth the following standard for a factual review of the evidence:

> [T]he court views all the evidence without the prism of "in the light most favorable to the prosecution." Because the court is not bound to view the evidence in the light most favorable to the prosecution, it may consider the testimony of defense witnesses and the existence of alternative hypotheses. The court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

*Stone,* 823 S.W.2d at 381 (citations omitted). After viewing all of the evidence, and the existence of alternative hypotheses, we conclude that the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's fourth point of error is overruled.

■ In his first point of error, appellant contends that Sections 19.02(b)(2) and 19.02(d) of the Texas Penal Code violate the Due Process Clause of the United States Constitution. This appears to present a question of first impression in this State. The instant offense occurred after the effective date of recent amendments to the statute, providing:

> (b) A person commits an offense if he:
>
> (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual..
>
> (d) At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

(Tex. Penal Code Ann. § 19.02 (West 1994)).

Prior to the effective date of the 1994 Penal Code amendments, the issue of sudden passion was included in Texas Penal Code Ann. § 19.04 under the offense of voluntary manslaughter, providing:

> (a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

*See* Penal Code, 63d Leg., R.S., ch. 399, sec. 1, § 19.03, 1973 Tex. Gen. Laws 883, 913, renumbered by Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1124 (Tex. Penal Code Ann.

§ 19.04, since amended). As amended in 1994, manslaughter is defined as follows:

(a) A person commits an offense if he recklessly causes the death of an individual.

(b) An offense under this section is a felony of the second degree.

Tex. Penal Code § 19.04 (West 1994).

Texas Court of Criminal Appeals' opinions predate the effective date of the 1994 amendment. The absence of sudden passion in § 19.04(a) was held to be an element of murder under § 19.02. Accordingly, the defendant was entitled to an acquittal on the murder charge unless the State proved the absence of sudden passion beyond a reasonable doubt. *See Ruiz v. State,* 753 S.W.2d 681 (Tex.Crim.App.1988); *Lawrence v. State,* 700 S.W.2d 208, 211–13 (Tex.Crim.App.1985). Appellant states that negating sudden passion continues as an element of murder where it is raised by the evidence. Consequently, appellant argues, since it is the State's burden to prove the elements of the crime, the shifting of the burden to the defendant constitutes a violation of the Due Process Clause of the Fourteenth Amendment to the United State Constitution.

*In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970), held the Due Process Clause "protects the accused against conviction except upon proof necessary beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Aside from Texas cases, appellant relies on *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). *Mullaney* involved the constitutionality of Maine statutes that designated murder and manslaughter as distinct offenses rather than different degrees of a single offense. The Supreme Court reasoned that under the Maine statutes, a life sentence could be imposed for any felonious homicide even those that traditionally might be considered involuntary manslaughter unless the defendant was able to prove that his act was neither intentional nor criminally reckless. *Id.* at 699, 95 S.Ct. at 1889–90. The court held that proving that a defendant did not act in the heat of passion on sudden provocation was similar to proving any other element of intent, and requiring the defendant to assume this burden was a violation of due process.

Later, in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court held a New York murder statute similar to our Section 19.02 constitutional against an attack that it violated the Due Process Clause. The offense of second-degree murder contained two elements: (1) intent to cause the death of another person, and (2) causing the death of such person or a third person. *See* N.Y. Penal Law § 125.25 (McKinney 1975). Similar to our Section 19.02(d), the New York statute provided that it is an affirmative defense that the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.* at 198 n. 2, 97 S.Ct. at 2321 n. 2. *Patterson* stated that consistent with New York law, the defendant had the burden of proving his affirmative defense by a preponderance of the evidence. *Id.* at 200, 97 S.Ct. at 2321–22. In the event the defendant met this burden, the jury was instructed to find the defendant guilty of manslaughter. The court observed: "[t]he mitigating circumstances of severe emotional disturbance is a considerably expanded version of the common-law defense of heat of passion on sudden provocation, and at common law the burden of proving the latter, as well as other affirmative defenses—indeed 'all ... circumstances of justification, excuse or alleviation rested on the defendant.'" *Id.* at 202, 97 S.Ct. at 2322–23. The court concluded under the New York statute the state was required to prove the death, the intent to kill, and causation beyond a reasonable doubt. "No further facts are either presumed or inferred in order to be convicted of murder." *Id.* at 206, 97 S.Ct. at 2324. The court held that the State of New York satisfied the mandate of *Winship* by requiring proof beyond a reasonable doubt of "every fact necessary to constitute the crime with which [*Patterson*] was charged." *Id.* at 206, 97 S.Ct. at 2325. We perceive no distinguishing factor between the affirmative defense appellant is required to prove by a preponderance of the evidence in the instant cause and the affirmative defense the defen-

dant had the burden of proving in *Patterson.* Our conclusion has additional support in *Patterson's* recognizing that at common law, the burden of proving common law circumstances of alleviation rested on the defendant. *Patterson,* 432 U.S. at 202, 97 S.Ct. at 2322–23. We hold that Section 19.02 of the Texas Penal Code, as amended in 1994, is not violative of the Due Process Clause of the United States Constitution. Appellant's first point of error is overruled.

■ In his second point of error, appellant contends that Section 19.02 of the Texas Penal Code, as amended in 1994, is contrary to the Texas Court of Criminal Appeals' holdings occurring after *Mullaney v. Wilbur* and *Patterson v. New York. See Cobarrubio v. State,* 675 S.W.2d 749, 752 (Tex.Crim.App. 1983); *Ruiz v. State,* 753 S.W.2d at 681; *Bradley v. State,* 688 S.W.2d 847, 851. While appellant is correct about these opinions' holdings that placing the burden on defendant to negate sudden passion was violative of the Texas Constitution, article 1, section 19, his argument overlooks the fact that all of these cases predate the effective date of the 1994 amendment to Section 19.02. Our holding that the negating of sudden passion is not an element of the offense after the 1994 amendment is dispositive of appellant's argument. We hold that Section 19.02 of the Texas Penal Code, as amended in 1994, is not violative of the due process provisions of the Texas Constitution. Appellant's second point of error is overruled.

■ In his third point of error, appellant contends that Section 19.02, as amended in 1994, violates the open courts provision of the Texas Constitution, article 1, section 13, by reserving the issue of sudden passion until the punishment stage of the trial. Appellant urges that the Legislature has abrogated the right to assert a well-established cause of action without stating the reason for its action outweighing legitimate constitutional rights. Appellant directs our attention to the

test for review of legislative action withdrawing well-established common-law remedies set forth in *Trinity River Authority v. U.R.S. Consultants,* 889 S.W.2d 259 (Tex. 1994), as follows:

> Legislative action withdrawing common law remedies for well-established common law causes of action for injuries to one's lands, goods, person or reputation is sustained only when it is reasonable in substituting other remedies, or when it is a reasonable exercise of the police power in the interest of the general welfare.

889 S.W.2d at 261. The following definitions (not inclusive) of "cause of action" appear in Blacks's Law Dictionary, Sixth Edition (1990) at 221:

> Facts which give rise to one or more relations of right-duty between two or more persons .... the right which a party has to institute judicial proceedings.

Appellant has not cited, nor have we found, any authority where appellant's position has been held applicable in the criminal context. We find the definition of cause of action inconsistent with proof of an element in a criminal offense. Moreover, *Patterson* stated at common law the defendant had the burden of proving affirmative defenses of alleviation. 432 U.S. at 202, 97 S.Ct. at 2322–23. Appellant's third point of error is overruled.

■ In his fifth point of error, appellant asserts the trial court erred in refusing his requested charge on the lesser included offense of manslaughter. Under Section 19.04, as amended in 1994, a person commits an offense of manslaughter if he "recklessly causes the death of an individual." [2] Appellant argues that the evidence shows that his firing of shots at the utility room of the apartment complex represented a reckless act rather than a culpable intent to cause serious bodily injury or death to anyone. "A person acts intentionally, or with intent, with

---

**2.** "Recklessly" or "reckless" is defined:
A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.
Tex. Penal Code Ann. § 6.03(c) (West 1994).

respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (West 1994).

Appellant did not testify nor does he point to any evidence to show that he knew the location of the utility room or that he was purposely shooting at that room. Undisputed expert testimony shows that all of the bullet and shrapnel damage found in the victim's second floor apartment was consistent with someone firing a rifle in a general upward fashion toward the apartments.

Appellant also directs our attention to evidence elicited from Westbrook that he was approaching the northeast corner of the complex at the time the shots were fired while "apparently" all of the shots fired by appellant struck the northwest corner of the complex. Without rehashing all of the evidence, Westbrook's testimony showed that he was moving fast from one corner to the other in order to protect himself from armed persons on both sides of the building that were firing at him.

Whether a lesser offense instruction must be given is governed by a two-part test:

(1) The lesser offense must be included within the proof necessary to establish the offense charged, and

(2) Some evidence must exist in the record that would permit a jury *rationally* to find that if the defendant is guilty, he is guilty only of the lesser offense.

*See Wolfe v. State,* 917 S.W.2d 270, 278 (Tex. Crim.App.1996) (emphasis added).

It appears undisputed that the first prong is met. However the evidence does not establish the second prong. The evidence shows no motive other than the intent to cause serious bodily injury to Westbrook. The gunfire that preceded the fatal shooting, the haste to procure an automatic rifle, and the intentional firing into the apartment do not comport with what a jury might rationally conclude was a reckless act. Accordingly, we hold that a jury could not rationally conclude that appellant killed the victim for reasons unrelated to causing serious bodily inju-

ry or death to Westbrook. Point of error five is overruled.

The judgment is affirmed.